# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5826 | **DATE** | Mar. 26, 2002 |
| **CASE TITLE** | Blanca Camarena v Safeway Ins. Co. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, ... of the motion being presented.]

memorandum opinion and order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Memorandum opinion and order entered. Defendant's motion to dismiss plaintiff's amended complaint is granted. Count 1, plaintiff's §§1981 and 1982 claim is dismissed with prejudice. The court declines to exercise supplemental jurisdiction over plaintiff's state law claims, which are dismissed with prejudice.
(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| X | Notices mailed by judge's staff. | | MAR 27 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | 35 |
| | Copy to judge/magistrate judge. | | | |
| GDS | courtroom deputy's initials | 02 MAR 26 AM 11:57 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BLANCA CAMARENA, )
)
Plaintiff, )
) No. 00 C 5826
v. )
) Judge Robert W. Gettleman
SAFEWAY INSURANCE COMPANY, )
)
Defendant. )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Blanca Camarena has filed a three-count amended class action complaint against defendant Safeway Insurance Company. Plaintiff alleges that defendant violated 42 U.S.C. §§1981 and 1982[1] (Count I), violated the Illinois Consumer Fraud Act, 815 ILCS 375/1 et seq. (Count II), and breached her automobile insurance contract (Count III). Defendant moves to dismiss plaintiff's amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons explained below, defendant's motion is granted.

---

[1] 42 U.S.C. §1981 reads, in pertinent part:

> All persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. §1982 reads, in pertinent part:

> All citizens . . . shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

DOCKETED
MAR 27 2002

**FACTS**

For purposes of a motion to dismiss, the court accepts the factual allegations of the complaint as true and draws all reasonable inferences in favor of plaintiff. Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir. 1996).

Plaintiff, a Hispanic resident of Illinois, purchased an insurance policy with defendant ("the policy") for her 2000 Ford Expedition in February 2000. According to plaintiff, during the early morning hours of April 9, 2000, the Ford, which was parked near her home, caught fire and was destroyed. Plaintiff alleges that defendant "refused to pay" her claim that resulted from that incident on the ground that defendant felt "that this is not a Insurance claim," but rather possibly "a malfunction," which is not an exclusion for claim payment listed in the policy.[2]

With the intention of representing a class of other similarly situated individuals, plaintiff further alleges that defendant is a "substandard" or "nonstandard" insurance carrier, which she defines as an insurance carrier that "primarily insures individuals who have, or think they will have, trouble obtaining insurance[,] and which engages in one or more" of the acts supposedly performed by defendant (discussed below). Plaintiff claims that defendant's clients are "disproportionately Hispanics, African-Americans, and members of other minority groups who are unable, or think they will be unable, to obtain insurance from 'standard' carriers because of 'redlining' and similar racially discriminatory practices." According to plaintiff, "[a]s a result of such practices, there is a dual market for automobile insurance in the Chicago metropolitan area, with Hispanics, African-Americans, and other minorities forced into the 'nonstandard' market."

---

[2] In making this allegation, plaintiff relies on a letter from defendant to Ford, the manufacturer of her vehicle, requesting that Ford inspect plaintiff's vehicle to determine whether the fire was caused by a malfunction.

2

Specifically, plaintiff avers that defendant "intentionally exploits [the] racially divided insurance market by targeting and taking advantage of its minority customers." Plaintiff also alleges that defendant has a "history of providing improper claims handling, by improperly denying or delaying payment of insureds' claims." According to plaintiff, defendant has a "high ratio of complaints received per premium dollars received" and "[v]irtually all of the complaints concern claims handling practices." Further, plaintiff alleges, defendant has a "policy and practice of denying payment on legitimate automobile theft claims of Hispanics, African-Americans, and other minority customers which it insures." One example of defendant's unlawful tactics is that it has "[theft] claims processed by 'investigators' who make extensive and intrusive requests for financial records from the insured and demands [regardless of whether there is anything suspicious about the particular claim] that the insured submit to an examination under oath." "Then," plaintiff continues, "if the insured declines to have his or her privacy invaded, or makes any statement during the examination which defendant believes to be incorrect, regardless of the materiality, defendant denies the claim." According to plaintiff, defendant "takes advantage of the fact that its Hispanic, African-American and other minority customers are unlikely to have the financial resources necessary to challenge claim denials." "All of the practices described above," plaintiff then asserts in conclusion, "constitute intentional exploitation by defendant of a racially divided auto insurance market in the Chicago metropolitan area and is done in a discriminatory manner and with discriminatory intent."

With respect to her claim under 42 U.S.C. §§1981 and 1982, plaintiff further alleges that, "The practices complained of were intentionally discriminatory and deliberately exploitative" and that, "Defendant's conduct was knowing and wilful and carried out for pecuniary gain."

3

According to plaintiff, she was damaged "in that [she] paid money for nonstandard insurance coverage" and "[was] not compensated for automobile losses ordinarily covered by standard automobile insurance policies."

Next, with respect to her Illinois Consumer Fraud Act claim, plaintiff alleges that defendant:

> engaged in unfair and deceptive practices by selling plaintiff . . . nonstandard automobile insurance coverage, while failing to disclose that improper and discriminatory claims practices would be employed where standard automobile insurance policies would not employ such tactics, failing to disclose that members of the class were being discriminated against, and denying payment on legitimate automobile theft claims of Hispanics and other minority customers which they ensure.

Plaintiff claims that she was damaged by defendant because she "paid money for nonstandard insurance coverage from a company that provided discriminatory claims handling practices" and because she was not "compensated for automobile losses ordinarily covered by standard automobile insurance policies."

Finally, plaintiff's breach of contract claim alleges that defendant "breached the terms of plaintiff's auto insurance polic[y] . . . by [vexatiously and unreasonably] denying [her] claim[] and by failing to pay," resulting in damage to plaintiff.

## PROCEDURAL HISTORY

The allegations above are taken from plaintiff's amended complaint. The court granted defendant's motion to dismiss the original complaint without prejudice, directing plaintiff to provide a more detailed definition of the term "substandard" as it was used throughout her initial complaint to describe defendant's company and practices. Plaintiff's initial complaint defined "substandard insurance carrier" as an insurance carrier that "insures individuals who have trouble

4

obtaining insurance." Plaintiff's initial complaint also used the word "substandard" in each place where the word "nonstandard" now appears.

Defendant points out, and the court agrees, that plaintiff's amended complaint does little to cure the problems pointed out during the court's oral ruling on defendant's motion to dismiss the original complaint. Although her definition of "substandard" has changed slightly, and the word "nonstandard" has sometimes been used in its place, the meaning of those terms remains unclear.[3] At various times, plaintiff uses these terms to describe part of the automobile insurance market, defendant's company generally, and also the particular coverage and services provided by defendant's company. In order to fit within all of their possible uses in plaintiff's amended complaint, these terms are necessarily generic, denoting at best "less than standard." Even so, in the interest of finality, the court will address the arguments raised (and now re-raised) by the parties weighing for and against dismissal of the instant case.

## LEGAL STANDARD

In ruling on a motion to dismiss for failure to state a claim, the court considers "whether relief is possible under any set of facts that could be established consistent with the allegations." Bartholet v. Reishauer A.G., 953 F.2d 1073, 1078 (7th Cir. 1992). A claim may be dismissed only if it is beyond doubt that under no set of facts would plaintiff's allegations entitle her to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Travel All Over the World, 73 F.3d at

---

[3] In fact, plaintiff has made the water murkier by adding and sometimes substituting the term "nonstandard" for "substandard"; whereas the term "substandard" at least denotes something less than standard, the term "nonstandard" can reasonably be interpreted to mean less or more than standard.

5

1429-30. The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide its merits. See Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990).

## DISCUSSION

The court begins with the arguments weighing for and against dismissal of plaintiff's federal claim: her allegation of racially discriminatory conduct by defendant in violation of 42 U.S.C. §§1981 and 1982. Defendant contends that Count I must be dismissed because it does not adequately plead that defendant intentionally discriminated against plaintiff or, alternatively, because Count I is barred by 15 U.S.C. §1012(b) ("the McCarran-Ferguson Act"). Plaintiff disagrees, arguing that she has averred the necessary elements to state a claim based on the "exploitation" discrimination theory adopted by the Seventh Circuit in Clark v. Universal Builders, 501 F.2d 324, 300-31 (7th Cir. 1974).

The plaintiffs' allegations in Clark were as follows:

[T]hat as a result of intense racial discrimination in Chicago and its metropolitan area there existed at all pertinent times a housing market for whites and a separate housing market for blacks, the latter confined to a relatively small geographical area in the central city. [The plaintiffs further] contended that the demand among blacks for housing greatly exceeded the supply of housing available in the black market and that the defendants exploited this situation by building houses in or adjacent to black areas and selling the houses to plaintiffs at prices far in excess of the amounts which white persons paid for comparable residences in neighboring urban areas, and on onerous terms far less favorable than those available to white buyers of similar properties, all in violation of plaintiffs' rights under the Thirteenth and Fourteenth Amendments and under the Civil Rights Act of 1866 [42 U.S.C. §1981 et seq.].

Examining these allegations, the Seventh Circuit held that:

[The] plaintiffs state a claim under section 1982 since they allege that (1) as a result of racial residential segregation dual housing markets exist and (2) defendant sellers took advantage of this situation by demanding prices and terms

6

> unreasonably in excess of prices and terms available to white citizens for comparable housing.

501 F.2d at 334.

Thus, to allege a claim of exploitative discrimination under Clark based on the facts of the instant case, plaintiff must allege that there are dual markets divided between minorities and non-minorities in the automobile insurance industry, and that the dual markets resulted from racial discrimination. Plaintiff must also allege that defendant exploited the dual markets by selling its policies to minorities at prices and terms unreasonably in excess of prices and terms available to non-minorities for comparable insurance policies. Examining plaintiff's allegations, the court finds that she has not adequately pleaded a claim under the Clark exploitation theory of discrimination.

First, plaintiff has failed to allege that the asserted dual automobile insurance markets—made up of "standard" and "substandard" or "nonstandard" insurance carriers—are divided according to the race of insureds. Plaintiff alleges that defendant is a substandard or nonstandard insurance carrier and that it insures "disproportionately Hispanics, African-Americans, and members of other minority groups who are unable, or think they will be unable, to obtain insurance from 'standard' carriers because of 'redlining' and similar racially discriminatory practices." Plaintiff also alleges that, "As a result of such practices, there is a dual market for automobile insurance in the Chicago metropolitan area, with Hispanics, African-Americans, and other minorities forced into the 'nonstandard' market."

But plaintiff does not allege that all of the supposedly substandard insurance companies "disproportionately" insure minorities. And, at any rate, the meaning of "disproportionately" is

7

unclear; does it mean that the majority of defendant's customers are minorities, or that more of defendant's customers are minorities compared to the customers of "standard" insurance carriers, or rather that the percentage of defendant's minority customers exceeds the percentage of minorities in the population generally? Likewise, it does not follow that just because defendant's insureds are supposedly deterred from the standard insurance market, all other minorities are likewise deterred. And, anyway, being "unable" to purchase "standard" insurance due to a racially discriminatory practice is quite different from one "think[ing] they will be unable" to do so as a result of such a practice. Obviously the type of automobile insurance one is able to obtain is affected by other factors, such as one's driving record. Moreover, based on the two newspaper articles that plaintiff references as defining "redlining," it is not clear that such a practice in the automobile insurance industry is racially motivated or discriminatory at all.[4]

---

[4] The first article, which appeared on page 52 of the Chicago Sun-Times back in March of 1993, refers to redlining as, "the practice of denying financial service in unpreferred or ethically changing neighborhoods." The article also explains that then-Illinois State Representative Cardiss Collins planned legislation to require companies selling auto insurance to make public "the kinds and amounts of insurance they sell, breaking it down by sex, race and census tract." The article then sets forth the apparent basis for the redlining allegations: that predominantly white districts in Chicago had "the most agents for major insurance companies," indicating, in the opinion of one member of the Illinois Public Action group, that "there is a conscious decision not to market in minority areas," though that individual indicated that he "can't prove" that allegation "without the information [Rep. Collins'] bill will require."
The second article, distributed by United Press International in January of 1990, explains how a researcher for the "Illinois Public Action Council" asserted that it would present evidence that "inner-city residents are being forced to buy insurance at overly high rates," leading the researcher to explain that, "Our concern is that these people are being forced into the arms of substandard carriers," defined as those carriers "who have history of not paying out on claims, and of bad service in general."
Significantly, in the instant case plaintiff does not allege that the dual market is geographically based, as is the case with the "redlining" discussed in the Sun-Times article.

8

Thus, based on all of the above, the court concludes that plaintiff has not alleged that a "contrived market condition" existed "which is grounded in and fed upon by racial discrimination," the result of which is that "the available supply of [automobile insurance] is determined by the buyer's race." See id. at 331. The court therefore concludes that plaintiff has not adequately alleged that the dual insurance markets, assuming they exist, came about because of racial discrimination.

Plaintiff's amended complaint also fails properly to allege that defendant takes advantage of its minority customers by providing them with lesser policies and/or services than those sold to non-minority insureds via the "standard" automobile insurance market at comparable prices. Plaintiff alleges that defendant takes advantage of its minority customers by "denying payment on legitimate automobile theft claims of Hispanics, African-Americans, and other minority customers which it insures"—claims which she asserts would be "ordinarily covered by standard automobile insurance policies." Plaintiff concludes that these practices "constitute intentional exploitation by defendant of a racially divided auto insurance market in the Chicago metropolitan area and is done in a discriminatory manner and with discriminatory intent."

These allegations assert merely that defendant's coverage and claims handling is not as good as that of "standard" insurers. But offering a product and service to one market that is inferior to that offered in another is not in itself discriminatory. As the court in Clark explained: "[§1982] does not mandate that blacks are to be sold houses at the exact same price and on the exact same terms as are available to white citizens. Reasonable differentials due to a mryiad of permissible factors can be expected and are acceptable." Id. at 333. Instead, the Clark court held that, "the benchmark for guiding a seller's conduct in the black market is reasonableness." Id.

9

What made the defendants' conduct arguably unreasonable in <u>Clark</u> is that the plaintiff in that case alleged that the defendants were exploiting the demand for housing within the black market by selling houses in that market "at prices far in excess of the amounts which white persons paid for comparable residences in neighboring urban areas, and on onerous terms far less favorable than those available to white buyers of similar properties." <u>Id</u>. at 300-31. Thus, the Seventh Circuit explained that, "By demanding prices far in excess of a property's fair market value and far in excess of prices for comparable housing available to white citizens[,] the seller ventures into the realm of unreasonableness."

In the instant case, plaintiff does not assert that the cost of defendant's coverage is unreasonable given the poor coverage and poor claims handling it provides its customers. In fact, plaintiff does not mention cost at all in her amended complaint. Thus, even if plaintiff had alleged that dual automobile insurance markets exist for minorities and non-minorities as a result of racial discrimination, the court finds that plaintiff has nonetheless failed to allege that defendant exploited the "substandard" market by demanding premiums far in excess of the fair market value of its coverage and claims handling in comparison to the premiums charged for the coverage and claims handling provided to non-minorities in the "standard" market. Put another way, the amended complaint fails to allege that the lower level of coverage and service offered by defendant are unreasonable in relation to the cost of its insurance. This omission is fatal under the fair market value criteria established by <u>Clark</u>.

Of course, had plaintiff properly alleged this last element of <u>Clark</u>, she would have hastened the demise of her claim from a different legal trapping: the McCarran-Ferguson Act. The McCarran-Ferguson Act declares that, "No Act of Congress shall be construed to invalidate,

impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." 15 U.S.C. §1012(b). As the Seventh Circuit noted in applying the McCarran-Ferguson Act in Doe v. Mutual of Omaha Insurance Co., 179 F.3d 557, 564 (7th Cir. 1999), cert. denied 528 U.S. 1106 (2000), "State regulation of insurance is comprehensive and includes rate and coverage issues." 179 F.3d at 564 (citing Lee R. Russ & Thomas F. Segalla, Couch on Insurance Sects 2:7, 2:20, 2:26, 2:35 (3rd Ed. 1997)). Proving this point, defendant identifies several Illinois regulations that together aptly address the allegations in plaintiff's amended complaint. The Illinois Insurance Code contains the Illinois Unfair Methods of Competition and Unfair and Deceptive Acts and Practices Act, 215 ILCS §5/421 et seq., which declares illegal:

> (3) Making or permitting . . . any unfair discrimination between individuals or risks of the same class or of essentially the same hazard and expense element because of the race, color, religion, or national origin of such insurance risks or applicants . . . . (5) Making or charging any rate for insurance against losses arising from the use or ownership of a motor vehicle which requires a higher premium of any person by reason of his physical handicap, race, color, religion, or national origin.

215 ILCS §5/424 (2001). The Illinois Insurance Code empowers the Illinois Director of Insurance to enforce this provision by examining and investigating insurers and, whenever necessary, to conduct hearings to determine wrongdoing. See 215 ILCS 5/426 (2001). The Illinois Insurance Code also prohibits improper claims handling, which includes:

> (a) Knowingly misrepresenting to claimants and insureds relevant facts or policy provisions relating to coverages at issue; . . . (c) Failing to adopt and implement reasonable standards for the prompt investigations and settlement of claims arising under its policies; (d) Not attempting in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become

11

> reasonably clear; . . . (h) Refusing to pay claims without conducting a reasonable investigation based on all available information; (i) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; . . . (n) Failing in the case of the denial of a claim or the offer of a compromise settlement to promptly provide a reasonable and accurate explanation of the basis in the insurance policy or applicable law for such denial or compromise settlement; . . . (r) Engaging in any other acts which are in substance equivalent to any of the foregoing.

215 ILCS §5/154.6 (2001). And finally, the Illinois Director of Insurance is also empowered to order any company violating the above provisions to "cease and desist from such practices" and, if necessary, to "suspend the company's certificate of authority for a period not to exceed 6 months or impose a civil penalty of up to $250,000, or both." 215 ILCS §5/154.8 (2001)

Although applying the exploitative theory of discrimination adopted in Clark appears to duplicate rather than conflict with the state regulations above, NAACP v. American Family Mutual Ins. Co., 978 F.2d 287, 295 (7th Cir. 1992), the court must still consider whether applying this theory under §§1981 and 1982 would frustrate any declared Illinois policy or interfere with Illinois' administrative regime. See Humana v. Forsyth, 525 U.S. 299, 309-10 (1999); Doe, 179 F.3d at 563. Judge Manning, in simultaneously ruling on three cases nearly identical to the instant case (and also brought by plaintiff's counsel), addressed this question and concluded that, while applying §§1981 and 1982 would not frustrate a declared state policy, doing so would interfere with Illinois' administrative regime. See Boyd v. Warrior Ins., No. 00 C 1849, Godinez v. The Eagle Ins. Agency, No. 00 C 1987, and McKenzie et al. v. Interstate Bankers Casualty Co. et al., No. 00 C 2747, slip op. at 7-11 (N.D.Ill. January 31, 2001). Judge Manning reasoned:

> [T]he essence of the plaintiffs' claims is that the defendants sold them second-rate insurance. Specifically, plaintiffs claim (among other things) that the limitation

12

> on automobile theft coverage in their policies is inferior and that the defendants sold substandard policies to them because they are [minorities]. To resolve this question, the court must determine whether the policies at issue in fact are unreasonable compared to the policies issued to non-minority motorists. In other words, the court must ask whether the defendants' policies are actuarially sound and consistent with state law in relation to the risks posed by the minority plaintiffs and their vehicles. The problem with this inquiry is that the Seventh Circuit has expressly stated that it is improper as it [interferes with states' administrative regimes by] necessarily caus[ing] federal courts to "step on the toes of state insurance commissioners."

Id. at 10-11 (quoting Doe, 179 F.3d at 564).

This court agrees with Judge Manning's conclusion. In order to determine whether defendant's conduct in the "substandard" insurance market is unreasonable under Clark, the court would have to examine the rates defendant charges for the coverage and claims handling services it provides, and compare those figures to those charged by "standard" insurers. In making this comparison, the court would necessarily have to take into consideration all of the factors that influence insurance rates charged by "nonstandard" insurers compared to those charged by "standard" insurers (for example, the driving record of the insured). As Judge Manning explained, this inquiry is improper because it necessarily causes federal courts to decide whether an insurance policy is actuarially sound and consistent with state law, thereby stepping on the toes of state insurance commissioners. Id. at 9, 11 (citing Doe, 179 F.3d at 564).

In conclusion, plaintiff's allegations fail to state a claim of exploitative discrimination under Clark and, even if plaintiff's allegations did state such a claim, it would nonetheless be barred by the McCarran-Ferguson Act as explained above.

## CONCLUSION

Therefore, the court grants defendant's motion to dismiss Count I, plaintiff's §§1981 and 1982 claim, with prejudice. In light of this ruling, the court declines to exercise supplemental jurisdiction over plaintiff's state law claims, which are dismissed without prejudice.

**ENTER:** **March 26, 2002**

*(signature)*

**Robert W. Gettleman**
**United States District Judge**